**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3258-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RICARDO CARRILLO, a/k/a
a/k/a RICARDO CARRILLO
SANTIAGO,

    Defendant-Appellant.

_____

Submitted on May 28, 2026 – Decided July 20, 2026

Before Judges Smith and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 16-09-0789.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Monique Moyse, Designated Counsel, on the brief).

Jennifer Webb-McRae, Cumberland County Prosecutor, attorney for respondent (Stephen C. Sayer, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Ricardo Carrillo appeals from an April 19, 2024 order denying his petition for post-conviction relief (PCR) without an evidentiary hearing, asserting his trial counsel was ineffective by not providing defendant discovery until after his trial concluded, and by not presenting an expert witness to refute the State's expert testimony.  After careful review, we affirm.

I.

On September 21, 2016, a Cumberland County grand jury returned an indictment charging defendant with:  first-degree murder of Neidy Ramirez, N.J.S.A. 2C:11-3(a)(1) to (2) (count one); first-degree murder of Genesis Rodriguez, N.J.S.A. 2C:11-3(a)(1) to (2) (count two); and second-degree disturbing, moving, or concealing human remains, N.J.S.A. 2C:22-1(a)(1) (count three).  At a September 28, 2018 pre-trial conference, defendant was offered a plea deal, where he would serve fifty years in prison after pleading guilty to the murder of Genesis and aggravated manslaughter of Neidy.[1]  Defendant rejected the plea offer.  In January 2019, defendant was tried and convicted on all counts.  On April 12, 2019, the trial court sentenced defendant

---

[1]  The Assistant Prosecutor also stated:  "[I]f I received a counteroffer of 45 years, I would certainly take that to the victim's family and to my superiors . . . ."

to two consecutive life sentences without parole on counts one and two, and ten years on count three, to be served concurrently with the life sentences. We affirmed the convictions and sentence on direct appeal. State v. Carrillo, No. A-4876-18 (App. Div. Oct. 27, 2022). On January 27, 2023, the Supreme Court denied defendant's petition for certification. State v. Carrillo, 252 N.J. 603 (2023). Defendant then filed a PCR petition, which the trial court denied without an evidentiary hearing. This appeal followed.

II.

The detailed facts of this case are set forth at length in our opinion addressing Carrillo's direct appeal, which we incorporate by reference. See Carrillo, slip op. at 4-9. We highlight only the facts relevant to this appeal.

Neidy Ramirez and her three-month old daughter Genesis went missing the day after Thanksgiving in 2015. The following Monday, Neidy's sister found her car on the side of the road on Route 55. The car doors were unlocked and Neidy's purse was still in the car. Neidy's sister called the police.

Detectives Miguel Rodriguez and Nelson Gonzalez were assigned to the investigation. They contacted defendant, who was Neidy's estranged husband, and asked if they could speak to him. Defendant stated he would come to police headquarters the next afternoon.

A-3258-23

At first, defendant stated he did not know where Neidy and Genesis were. He claimed he dropped off two of their children to Neidy on Thanksgiving Day and picked them up on Friday evening. Defendant told the police he called Neidy four or five times on Saturday, but she did not answer. Defendant gave the police permission to search his phone.

If the phone's GPS location services was turned on, GPS data information tracking the phone's movements would be obtained during the extraction process. Once the GPS data information was extracted, the data would then be transferred to third-party applications such as Google Maps, Google Earth, and/or GPS visualizer. Rodriguez provided a consent form for defendant to sign to allow the forensic examination of his cell phone.

After defendant signed the consent form, the detectives continued to question defendant. Rodriguez administered Miranda[2] warnings to defendant and he waived his right to remain silent. Defendant claimed he had a good relationship with Neidy, although he admitted they frequently argued.

Gonzalez asked defendant whether he had a Gmail account. Defendant replied that he did, and he voluntarily gave the detective his username and password for that account. Gonzalez testified the Gmail account information

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

was needed to transfer the GPS data information that had been extracted from the cell phone into the Google Maps application to generate a map of the information.

Defendant began to tell inconsistent stories concerning his whereabouts over the holiday weekend. The detectives then confronted defendant with the fact the GPS data from his phone did not match his account of the day Neidy and Genesis disappeared. Indeed, the data showed defendant had visited a wetland area known as "Back Neck" on Friday, then went to Neidy's apartment, then to his house, then back to Neidy's apartment, before returning to Back Neck.

At first, defendant claimed he took Neidy to Back Neck so they could be intimate with each other. However, he said they began to argue in the car and she hit him in the face. He told the detectives he took her keys and left her in the car on Route 55.

Finally, defendant confessed he had gone to Neidy's home on Friday night and argued with her because he was upset she was in a relationship with another man. After she taunted him, defendant grabbed Neidy's neck and strangled her until she was no longer breathing. Defendant claimed Genesis died when he and Neidy fell on top of the baby during their argument. Defendant stated the baby

5

was twisting her body in a strange manner and he covered her mouth with his hands so she would stop. He then placed a "ribbon" around Neidy's neck.

Defendant stated he put Genesis in a trash bag and took the baby and Neidy to Back Neck in the back of Neidy's car. He then dumped the bodies there in different locations before leaving the car on the side of the road. Defendant agreed to help the detectives locate the bodies, and they placed him under arrest.

After the detectives recovered the bodies, they returned with defendant to headquarters and continued their interrogation. Defendant stated he decided to kill Neidy early on Friday. He also stated he wanted to seek "revenge" and "vengeance" for the way Neidy had treated him.

The medical examiner testified that Neidy died from "[b]lunt neck trauma and that would involve manual and ligature strangulation." The expert stated defendant used his hands and a wire or phone cord to strangle Neidy. He testified Genesis died as the result of "[c]hest compression asphyxia, which is squeezing of the chest, where … the person can no longer breathe." The medical examiner ruled both deaths were homicides.

Defendant testified on his own behalf at trial. He admitted he strangled Neidy to death after she started hitting and pulling his hair during their argument. He claimed that Neidy grabbed him by his neck and his knee hit

6

Genesis in the chest as he fell. Defendant stated the baby had a "dent" in her chest. Defendant stated he used his hands and a ribbon from a Christmas tree to strangle Neidy. He stated he decided to hide the bodies because he "was desperate" and did not want to go to jail.

In his counseled brief, defendant asserts:

> MR. CARRILLO IS ENTITLED TO AN EVIDENTIARY HEARING ON HIS CLAIM THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO PROVIDE HIM WITH DISCOVERY PRETRIAL AND BY FAILING TO PRESENT AN EXPERT DURING TRIAL.

We reject these contentions and affirm.

## III.

"Our review of a PCR court's factual findings is 'necessarily deferential.' However, we review a PCR court's legal conclusions de novo." State v. Hernandez-Peralta, 261 N.J. 231, 246 (2025) (citation omitted) (quoting State v. Nash, 212 N.J. 518, 540 (2013)). That de novo review extends to whether an evidentiary hearing was necessary to rule on the merits of a PCR petition because, in the absence of PCR, a defendant may argue an evidentiary hearing is warranted to develop the factual record in connection with an ineffective assistance of counsel claim. See State v. Porter, 216 N.J. 343, 354-55 (2013). However, the PCR court should grant an evidentiary hearing only where: (1) a

defendant is able to establish a prima facie case of ineffective assistance of counsel; (2) there are material issues of disputed fact that must be resolved with evidence outside of the record; and (3) the hearing is necessary to resolve the claims for relief. See R. 3:22-10(b); Porter, 216 N.J. at 354.

We preface our analysis by acknowledging the well-known legal principles governing PCR appeals. PCR is analogous to the federal writ of habeas corpus. State v. Pierre, 223 N.J. 560, 576 (2015). To be entitled to an evidentiary hearing, the petitioner must "allege specific facts and evidence supporting his allegations." Porter, 216 N.J. at 355.

Both the Sixth Amendment to the United States Constitution and Article 1, Paragraph 10 of the State Constitution guarantee the right to effective assistance of counsel at all stages. Strickland v. Washington, 466 U.S. 668, 686-87 (1984); State v. Fritz, 105 N.J. 42, 58 (1987). In addressing an ineffective assistance of counsel claim raised in a petition for PCR, New Jersey courts follow the two-part test articulated in Strickland, 466 U.S. at 687. See Fritz, 105 N.J. at 58. "First, the defendant must show that counsel's performance was deficient." State v. Gideon, 244 N.J. 538, 550 (2021) (quoting Strickland, 466 U.S. at 687). "Second, the defendant must have been prejudiced by counsel's deficient performance." Ibid.

To meet the first prong of the <u>Strickland/Fritz</u> test, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Strickland</u>, 466 U.S. at 687. Reviewing courts provide "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Id.</u> at 689. However, a defendant may rebut the presumption of effectiveness by proving trial counsel's actions were not "sound trial strategy." <u>State v. Arthur</u>, 184 N.J. 307, 319 (2005) (quoting <u>Strickland</u>, 466 U.S. at 689).

The second <u>Strickland</u> prong requires the defendant to show counsel's errors created a "reasonable probability" that the outcome of the proceeding would have been different if counsel had not made the errors. <u>Strickland</u>, 466 U.S. at 694. This "is an exacting standard." <u>Gideon</u>, 244 N.J. at 551 (quoting <u>State v. Allegro</u>, 193 N.J. 352, 367 (2008)). Prejudice is not presumed but must instead be affirmatively proven by the defendant. <u>Ibid.</u>

In case where a defendant is offered a plea deal, "a defendant has the right to effective assistance of counsel in considering whether to accept [a plea offer]. If that right is denied, prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence." <u>Lafler v. Cooper</u>, 566 U.S. 156, 168 (2012); <u>see also</u>

A-3258-23

<u>State v. Chau</u>, 473 N.J. Super. 430, 445 (App. Div. 2022) ("There is now, of course, no question but that a defendant is entitled to effective assistance in the process of negotiating a plea.").

Before the trial court, defendant raised two grounds of ineffective assistance of counsel. First, he claims trial counsel failed to provide him with discovery materials turned over by the State. Defendant argues he would have accepted the State's plea offer if trial counsel had provided him with the discovery file. He mistakenly contends, "The offer was for no more than 43 years in prison, while Mr. Carrillo was ultimately sentenced to two consecutive terms of life without parole. Accordingly, but for counsel's deficient performance in failing to present him with full discovery pretrial, he received a higher sentence than he could have received."

We reject this argument. Defendant claimed he was not fully aware of the evidence against him because of his attorney's failure to provide discovery, but that contention is belied by the record. On September 28, 2018, the trial court held a pre-trial conference regarding the State's plea offer. Before defendant made a decision regarding the plea, the State summarized the proofs it intended to present at trial. Defendant then had the following colloquy with the court:

> [THE COURT:] All I need you to do is tell me first of all, whether you need to talk to your lawyer a little bit

longer today which I'll let you do.  Make sure you make the best decision . . . .

Do you want to take whatever time I have today to talk to your lawyer anymore today about this decision before you tell me your final answer?

THE DEFENDANT:  (Through Interpreter) No.

THE COURT:  So you're ready to make the decision now?

THE DEFENDANT:  (Through Interpreter) Yes.  Yes.

THE COURT:  And you understand that once you make that decision, you can't go back on it?  It's not . . . going to happen?

THE DEFENDANT:  (Through Interpreter) Yes, yes.

THE COURT:  All right.  So what's your decision?  Do you want to go to trial?

THE DEFENDANT:  (Through Interpreter) Yes, it's like either way, because the [plea] offer is so high.  So I'm going to try.

On appeal, defendant fails to detail what discovery was not summarized by the State in its proofs before he agreed to reject the fifty-year plea offer, or how that evidence would have affected his decision to reject the plea.  The record demonstrates defendant made a fully informed decision to reject the plea offer.  He did so after hearing the State summarize the evidence it intended to present at trial, including the GPS evidence and his confession.  Defendant has not established a "reasonable probability" he would have accepted the plea offer

11

had his attorney provided him with the discovery files.  <u>Strickland</u>, 466 U.S. at 694.

In his second claim, defendant asserts counsel was ineffective in failing to present an expert medical witness at trial to refute the State's evidence.  The medical examiner testified Genesis died of a prolonged, squeezing chest compression.  Defendant, in contrast, testified Genesis died when he and Neidy Ramirez accidentally fell on her, and his knee accidentally went on her chest, indicating that the compression was quick, not prolonged or squeezing.  To rebut Dr. Feigin's claim, defendant's trial counsel had planned to offer a competing expert, "Dr. S."[3]  However, Dr. S. refused to testify.  As we explained in our opinion on direct appeal:

> Before the State was set to rest its case, defense counsel notified the court and the State that it had retained [Dr. S.] as a medical expert to rebut the State medical examiner's testimony as it was "surprised" by his opinion concerning the length of time it took for Genesis to die from chest compression asphyxiation. The defense proffered that [Dr. S.'s] testimony would have disputed the State expert's conclusion that Genesis died from chest compression asphyxiation that lasted thirty to sixty seconds in support of the defense theory that Genesis died when defendant and Neidy fell on top of Genesis.

---

[3]  We use the doctor's initials because of the reference to an expunged conviction.

In 1997, [Dr. S.] was convicted in New Jersey of third-degree witness tampering. As a result of the conviction, his medical license was suspended for over seven years, in part retroactively, by way of a consent order with the Board of Medical Examiners dated January 11, 2006. His license was reinstated on July 22, 2008, and [Dr. S.] later had his conviction expunged.

Despite the defense violation of Rule 3:13-3, which requires notice of an expert within thirty days in advance of trial, the court held Dr. S. would be allowed to testify concerning Genesis's death. As to the impeachment issue, the court held the State could cross-examine Dr. S. as to both his expunged conviction and his suspended medical license. The court held that "the State has every right to cross-examine the doctor on the suspension of his medical license for seven and a half years."

[Carrillo, slip op. at 24-25.]

After the trial court ruled the State could cross-examine Dr. S. for impeachment purposes with both his expunged conviction and suspended medical license, Dr. S. refused to testify.

According to defendant, trial counsel "should have moved to subpoena the expert," and "[i]t was unreasonable to fail to present such vital evidence to the jury." However, Dr. S.'s refusal to testify is not attributable to trial counsel, who could not have forced him to take the stand. See Rocco v. N.J. Transit Rail Operations, Inc., 330 N.J. Super. 320, 342 (App. Div. 2000) ("The opinion of an

13

expert, as opposed to testimony of facts perceived, may not ordinarily be compelled against the expert's wishes.").  Therefore, Dr. S.'s refusal to testify was not the result of trial counsel's deficient performance.

Finally, because defendant failed to demonstrate a prima facie case of ineffective assistance of counsel pursuant to both prongs of <u>Strickland</u>, an evidentiary hearing was not warranted.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M. C. Hanley

Clerk of the Appellate Division

A-3258-23